## RENWICK *vs.* RENWICK.

*In the matter of the Estate of* WILLIAM RENWICK, *deceased.*

IT is a general rule that the heir cannot be prejudiced by the act or admission of the executor or administrator. But a covenant in a lease to pay the value of improvements, as appraised at the end of the term by appraisers to be appointed by the parties, " their heirs, executors, administrators or assigns," authorizes the administrators to appoint the appraisers, in default of a nomination by the heirs, and the appraisement made by the persons so appointed, will bind the heirs in respect to the land descended.

Upon an application to sell the real estate of an intestate for the payment of his debts, equitable as well as legal demands may be proved and established against the estate.

An equitable claim being an equitable lien on a certain portion of the real estate, is not an express charge upon the property, and not being secured by mortgage or judgment, may be directed to be paid out of the proceeds of the real estate, when sold under the order of the Surrogate for the payment of the debts of the deceased.

The heirs may set up the statute of limitations in bar to such claims as are presented to the Surrogate, upon proceedings to sell the real estate.

If a portion only of the heirs object to certain demands, and the objection is sustained, the entire claim must be rejected, and the Surrogate cannot re-

ject only such part of the demand as would be the proportion falling on the share of the heirs objecting.

JOSEPH BLUNT, *for the Administratrix.*

D. D. LORD, *for James Renwick.*

W. S. SEARS, *and* S. M. WOODRUFF, *for Creditors of R. J. Renwick.*

THE SURROGATE. On the application made by the administratrix, to sell the real estate of the deceased for the payment of his debts, two of the claims were contested by the judgment creditors of Robert J. Renwick, one of the heirs at law, and by the guardian *ad litem* of the minor children of Jane Wilkes, deceased, also heirs at law.

The first claim is that of James Renwick, and arises under a covenant contained in a lease executed by the deceased, March 8, 1831, for seventeen years from May 1, 1831, to James H. Lyon, of premises No. 554, Broadway, of which lease James Renwick became assignee, March 11, 1848, under an assignment from the executor of George Suckley, deceased, who was the assignee of Lyon, the lessee. The intestate, William Renwick, died August 31, 1847, and letters were issued to the administratrix, November 17, 1847. The clause in the lease under which the claim is made, is in the following words : " And it is hereby mutually understood, covenanted and agreed, by and between the said parties of the first and second parts, that all such buildings of brick and stone, as may be erected upon the said demised premises, by the said party of the second part, his executors, administrators or assigns, during the term hereby demised, and be standing thereon at the expiration of the said term, shall, ten days before the expiration of the said term, be appraised and valued by three respectable and indifferent persons, one of whom to be appointed by each of the said parties of the first and second parts, their heirs, executors, administrators or assigns, and the third person by the said two persons to be appointed as aforesaid, whose appraisement, or that of any two of them, in writing, under their hands and seals, of the

then value of the said buildings, shall be final and conclusive between the respective parties, and shall constitute the sum to be paid by the said party of the first part, his heirs or assigns, to the said party of the second part, his executors, administrators or assigns, for the buildings aforesaid. And the said party of the first part doth, by these presents, for himself, his heirs, executors and administrators, covenant, promise and agree to, and with the said party of the second part, his executors, administrators and assigns, that he, his heirs or assigns, shall and will, well and truly pay to the said party of the second part, his executors, administrators or assigns, the amount to be expressed in the appraisement aforesaid, on the expiration of the said demised term."

Mrs. Renwick, the administratrix, some time in April, 1848, appointed John A. Harriott, as an appraiser, in behalf of the estate of William Renwick, and James Renwick, the assignee of the lease, appointed Levi Onderkonk, as an appraiser on his part. These two, selected Henry C. More as a third, and on the 30th April, 1848, they reported an appraisement under their hands and seals, fixing the value of the buildings at three thousand six hundred dollars. It is insisted that this appraisement is not binding upon the heirs, the appraiser on behalf of the estate having been chosen by the administratrix. There is no doubt as to the general principle, that the heirs cannot be prejudiced by the admission or act of the administrators or executors. (*Mooers* vs. *White,* 6 *Johns. Ch. R.,* 360.) But by the express terms of the covenant made by the intestate, under which this claim is advanced, the "*administrators*" of either party are authorized to appoint an appraiser; and I think, therefore, that the administratrix of William Renwick, was competent, in the absence of any other nomination by other parties in interest, to make the appointment under the letter of this covenant. The objection, that the appraisement was not made "ten days before the expiration of the term," has more weight, and might probably at law, bar an action by James Renwick. At law, a

covenant must be strictly and literally performed. But in determining the validity of subsisting claims against the estate of the deceased, the Surrogate is not limited merely to legal demands. In this proceeding, an equitable as well as a legal demand may be proved before him, and its payment decreed. Now, Courts of Equity, from time immemorial, have been in the habit of relieving against the strict performance of conditions and covenants. It is sufficient in equity, if they be really and substantially performed according to the true intent and meaning of the parties; and if by ignorance not wilful, mistake or unavoidable accident, there is a failure of accurate compliance with the letter of the condition, the Court will interpose and give relief, upon compensation being made. The point of failure in the present case is time, and it is well settled that time must be of the substance or essence of the agreement, or otherwise, it will generally, in this respect, be conscientious that the agreement should still be performed. (*Eaton* vs. *Lyon,* 3 *Vesey,* 692 ; *Pincke* vs. *Curteis,* 4 *Bro. C. C.,* 329 ; *Davis* vs. *Hone,* 2 *Sch. & Lef.,* 347 ; *Lennon* vs. *Napper, Ibid.,* 684 ; *Maxwell* vs. *Ward,* 11 *Price,* 17 ; *Taylor* vs. *Popham,* 1 *Bro. C. C.,* 168 ; *Winne* vs. *Reynolds,* 6 *Paige,* 407 ; *Edgerton* vs. *Peckham,* 11 *Paige,* 352.) I cannot imagine any view of the case in which the covenant in question, as to its substance, hinges upon time. The thing to be paid for is the building on the premises ; the time at which it is to be paid for is the expiration of the term, and the only reason to be conceived, why the appraisement should be made ten days before the expiration of the term, is the convenience of the parties in arranging the appraisement, giving sufficient time to the appraisers to discharge their duty considerately, and in having, themselves, notice previous to the day of payment, of the amount to be paid. These were probably the inducements to fixing the time, and I could not, therefore, even in an equitable view of the case, take upon myself to dispense with the performance of the covenant in respect to time, so

as to take the appraisement for conclusive evidence of the value of the property. But independently of that document, it appears in proof, that the improvements were at the expiration of the term, of the value therein stated. The case then stands in this way; there was a fair effort on the part of the assignee of the lease, to have the improvements appraised; they were in fact valued before the expiration of the term; their value has been ascertained and proved to the Court; the heirs have received the benefit of the improvements in the enhanced value of the property; and I am now required to say, that the time of the stipulated appraisement was so far essential to the substance of the contract, as to destroy an equitable claim for the value of the improvements. I do not think this position consistent with justice as it has been administered in Courts of Equity, but on the other hand, have no doubt that the assignee has a lien in equity upon the premises, which might long since have been enforced there. His claim not being secured by judgment or mortgage, or expressly charged on the lot, I must direct its payment out of the proceeds of the real estate (2 *R. S.*, 3*d ed.*, *p.* 165, § 17), with interest from May 1, 1848. ( *Van Rensselaer* vs. *Jewett*, 2 *Comstock*, *R.* 135.)

The remaining contested claim is that of Mrs. Renwick, the mother of the intestate, and his administratrix, and which is founded upon the receipt by the deceased at sundry times of certain sums belonging to her, and paid by the United States government under the indemnity treaty with France. The payments were made at different dates, from June 16, 1836, to December 11, 1838, and a right of action for the recovery even of the last amount received by the deceased, was barred by the statute of limitations in December, 1844, nearly three years before the intestate died. Some of the heirs set up this defence, and I am bound to entertain it. (2 *R. S.*, 3*d ed.*, *p.* 165, § 13.). It is insisted, however, that the statute does not apply, because the moneys were received by William Renwick as the agent of his mother, and also because there were run-

ning accounts between the parties, and payments were made by the intestate within six years.

An agency is not such a technical trust as to prevent the application of the statutory limitation of six years to a liability arising on a simple contract. It was entirely competent for Mrs. Renwick to have brought an action at law for the recovery of this claim. (*Murray* vs. *Coster*, 20 *J. R.*, 576, 5 *J. C. R.*, 522; *Lillie* vs. *Hoyt*, 5 *Hill.*, 396; 4 *Mason's C. C. R.*, 152; *Angell on Limitations*, 186.) Besides this, there is no direct evidence to show that the deceased received these payments as agent for his mother. They were made to him personally on negotiable certificates and a check; from a fact of which kind standing alone, instead of a presumption of agency arising, the law implies he received them in his own right as a holder for a valuable consideration. It is true it appears the deceased was the general agent of his mother in the management of her business, and generally in the absence of any explanation where an opportunity to give it exists, that circumstance would have force towards attaching the agency to these large payments; but then it must be recollected, that in consequence of William Renwick's decease, the opportunity for explanation is diminished, and the *hiatus* in the accounts produced before me, increases the difficulty of arriving at any certain conclusion, as well as the danger of indulging any other presumption than such as is fairly deducible from the precise transaction itself, upon which this liability is sought to be enforced.

But two account books of the deceased have been produced. One of these is a memorandum book of house expenses (the intestate having lived with his mother), from January 1836, to September, 1840. The items consist entirely of payments, and the last entry was made seven years previous to the intestate's death. There is nothing in this, therefore, to save the statute. The other is the check book of the deceased, from January 1837, to December 31, 1842, in which appear certain payments for house

expenses and ground rent, which are claimed to have been made on account of Mrs. Renwick. The last entry of this kind is under date of June 24, 1842. This entry would save the statute if it appeared to relate to a payment on account of these French claims. But there is no evidence of that, while it may just as well be referred to the disbursement of moneys received by the deceased for his mother from other sources. A payment must be on account of a particular debt, to raise the presumption that the debt is due. Payment of a particular sum does not necessarily imply it was in part payment of some larger debt, and so take the larger debt out of the statute. (*Angell on Limitations*, 266.) I do not see how under any view of the case the claim can be sustained. The amount received by the deceased on French claims appears to have been $9900, but on whose account does not appear expressly. By the memorandum book, it is evident he was in the habit of paying out for his mother between two and three thousand dollars per annum, and there is testimony to show this habit continued to the time of his death. This book stops in 1840, and I am left without a particle of evidence in regard to his subsequent payments, from which it is possible for any body to deduce any thing like an accurate notion as to the state of accounts at the time of his death. Indeed, I cannot approach any where near an estimate, for there is an utter blank for seven years previous to his decease, except a few entries in the check book. It is said the house expenses were furnished by him from another fund,—from other moneys of his mother. But I have only a general statement to that effect; nothing definite appearing as to the amount of such other resources. Besides, if the items in the account book of the house expenses were paid out of other funds, and that was the general rule of all expenses of that kind, then the ground rent entered in the check book must fall under the same head, and be considered as a payment, on account of funds derived elsewhere than from the French claims; for

this very item of ground rent appears in the account of house expenses. The claim of the administratrix may be just, and still fail in obtaining a valid standing in Court, in consequence of the condition in which the accounts of the deceased have been kept; but if large amounts are left in this way without vouchers, or account books, or other data to show the dealings of the parties, it presents a case belonging to that very class of transactions which the Legislature have thought it wise to reach by the statute of limitations. The rule, though it may bear hard in the present instance, is in general a safe and salutary one. I am of opinion, therefore, that this claim should be disallowed. This cannot be done partially, that is, as counsel contended, for such sum as would be the proportional part falling on the share of the heirs objecting; but the objection reaches the whole claim. If the other heirs choose to waive the statute and admit the debt, such a design can only be attained by private arrangement, independently of the present proceeding.